UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
HARTFORD DIVISION

| | | |
|---|---|---|
| IN RE: | : | CHAPTER 7 |
| | : | |
| SIMA INTERNATIONAL, INC | : | Case No. 17-21761 (JJT) |
| | : | |
| DEBTOR. | : | RE: ECF Nos. 15, 22 |

_____

**MEMORANDUM OF DECISION ON TRUSTEE'S MOTION TO
REJECT EXECUTORY CONTRACT AND SECTION 365(n) ELECTION**

I.      INTRODUCTION

The matter before the Court is the Motion to Reject Executory Contract ("Motion", ECF No. 15) between SIMA International, Inc., ("SIMA" or "Debtor") and a non-debtor, Marlys Hanson, Inc. ("MHI") filed by the Chapter 7 Trustee ("Trustee"). Also before the Court is an Objection and Election to Retain Rights Under 11 U.S.C. § 365(n)(1)(B) ("Election", ECF No. 22) filed by MHI. In the context of this dispute, the parties have explicitly sought a determination of their respective rights related to trademark use and rights to engage or prevent the development of competing products, as provided in Section 6 of the Sublicense and Ownership Agreement by and Between People's Management International, L.L.C and Marlys Hanson, Inc., ("License Agreement") without the necessity of a formal Adversary Proceeding. Accordingly, the Court will address:

i.      Whether the Trustee's rejection of the License Agreement should be approved;

ii.      Whether MHI has duly elected under Section 365(n);

iii.      Whether the Section 365(n) election entitles MHI to use the SIMA trademark; and

iv.     Whether the Section 365(n) election also preserves unto MHI the exclusive rights under Section 6 of the License Agreement to prevent the development of competing products

II.     JURISDICTION

This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334(b) and may hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a) and (b)(1). This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (E) and (O). Venue is proper in this court under 28 U.S.C. § 1408.

III.    BACKGROUND[1]

The Debtor Corporation is the sole and exclusive owner of certain copyrights, trademarks and other intellectual property relating to a unique System for Identifying Motivated Abilities ("SIMA®"). The Debtor had entered into licensing agreements with various parties, which allowed such parties to utilize the intellectual property to create or develop derivative works, modifications, revisions, or other improvements relating to the SIMA® technology.

On or about September 24, 1996, People Management International, L.L.C. ("PMI") and MHI entered into the License Agreement dated September 16, 1996.[2] The License Agreement provided that the Debtor would license, *inter alia,* all intellectual property associated with SIMA®, which included but was not limited to the trademarks and copyrights therein, to MHI for purposes of developing "adaptations." In exchange, the Debtor would receive royalties from MHI's gross revenues generated from the developed product. SIMA ® – the process that is the subject of the License Agreement – is an evidence-based process that analyzes an individual's

---

[1] The facts herein are based upon judicial notice of the docket, undisputed facts advanced by the parties, or have been derived from the subject License Agreement.

[2] People Management International, L.L.C. was a Delaware corporation that assigned its rights in the 1996 License Agreement to the Debtor on January 16, 2006. The Debtor was incorporated in Connecticut as a nonstock corporation under the name People Management International Inc. on June 27, 2005 and changed its name to SIMA International, Inc. on July 28, 2008.

descriptions of life and work achievements in order to uncover the recurring behaviors that characterize the individuals' unique way of approaching any task or role.[3] These recurring behaviors in turn serve to identify "Motivational Patterns" that can be used to identify the kinds of jobs or career positions that will best "fit" the individual. These motivational patterns help individuals to manage and enhance their own careers and they assist employers in managing the careers of their employees through decisions about recruiting, retaining and promoting employees.[4]

Shortly after entering into the License Agreement, MHI created and developed a software program, known as CAPS.[5] CAPS is an adaptation of the SIMA® method which allows the user to analyze the biographical material provided by a subject and to prepare a full SIMA® Motivational Pattern in a matter of seconds, instead of in the 6 to 8 hours that an analyst would require when using the original SIMA® method.[6]

On November 17, 2017, ("Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code ("Bankruptcy Code").  On December 7, 2017, the Trustee filed the instant Motion seeking authorization of the Court to reject the License Agreement with MHI pursuant to 11 U.S.C. § 365(a). Shortly thereafter, MHI filed an Objection to the Motion, electing therein to retain its rights to the License Agreement pursuant to 11 U.S.C. § 365(n)(1)(B).[7] On January 15, 2018, the Trustee filed a reply ("Reply" ECF No. 29).

---

[3] Objection of Marlys Hanson, Inc. to Motion to Reject Executory Contract and Election to Retain Rights Under 11 U.S.C. § 365(n)(1)(B) at ¶ 4. (hereinafter "Objection")
[4] *Id.*
[5] *Id*. at ¶ 5.
[6] *Id*.
[7] The Objection submitted by MHI is less of an objection per se to the Trustee's Motion to Reject, as it is more of a response to clarify a number of characterizations contained in the Motion, which MHI disputed or otherwise disagreed with, while formalizing its written election of rights under Section 365(n).

On January 18, 2018, both parties appeared and presented oral argument before the Court. The parties were ordered to file supplemental memoranda in support of their respective arguments. On January 26, 2018, MHI filed a supplemental memorandum of law in support of the Objection to the Motion and Election to Retain Rights under 11 U.S.C. § 365(n)(1)(B) ("Objection Memo," ECF No. 38). Shortly thereafter, the Trustee filed a supplemental memorandum of law in support of the Motion ("Motion, Memo" ECF No. 39). On March 1, 2018, both parties again appeared and delivered oral arguments at a non-testimonial hearing. The Court thereafter took the matter under advisement.

In this case, the Chapter 7 Trustee seeks to reject the License Agreement giving certain use of, *inter alia*, the Debtor's trademark and exclusive licensing of intellectual property to MHI. It is undisputed that the License Agreement between the parties is an executory contract. The parties agree that the Trustee has the inherent authority under Section 365 to seek rejection of the License Agreement and that MHI has the option to treat the License Agreement as terminated or as a breach and elect to retain its rights to the intellectual property pursuant to Section 365(n). The Trustee has advanced that the continuing obligations under the License Agreement are burdensome and that a rejection order would likely enhance the value of the license in a bankruptcy sale.[8] MHI has not contested the Trustee's business judgment or his contentions regarding the burdens of continued performance.

The parties fundamentally disagree as to whether the Section 365(n) election entitles MHI to the continued use of the SIMA® trademark. The parties similarly disagree as to whether the election preserves unto MHI the exclusive rights under Section 6 of the License Agreement,

---

[8] The Trustee asserts that the License Agreement currently generates approximately $100,000 per annum and projects that its revenue potential will be substantially enhanced if unbridled from its obligations and MHI's rights.

which limits the parties' ability to sell or enter into any agreement with any other person for developing, manufacturing or selling a "competing product."

The Trustee's Motion acknowledges that under the explicit terms of the License Agreement, MHI maintains an exclusive right to develop software involving the SIMA® technology and neither the Debtor nor any third party can engage in upgrading or improving the software.[9] The Motion argues that in the event this Court upholds the provisions contained in Section 6 of the License Agreement and MHI retains the exclusive license to develop the software for the SIMA® process and/or technology, the fair market value of SIMA®, including its copyrights, trademarks and other intellectual property would be greatly reduced.[10] The Motion further asserts that it is prudent and in the best interest of the estate and the creditors of the estate that the Court allow the Trustee to reject the License Agreement in its entirety.[11]

MHI's Objection seeks affirmation that the limitations contained in Section 6 of the License Agreement provide that neither party will sell any "competing product," as defined in the License Agreement or enter any agreement with any other person for "developing, manufacturing or selling a competing product."[12] MHI also seeks affirmation that while it seeks to preserve its exclusive rights under the License Agreement, MHI has never taken the position that its exclusive rights include every possible software adaptation of the SIMA® technology.[13] The Objection asserts that neither the Debtor nor third parties are prevented from updating or improving the software as there have been at least three software adaptations of SIMA® that were developed without objection from MHI.[14] The Objection further asserts that as a matter of

---

[9] Motion at ¶ 7.
[10] *Id*. at ¶ 10.
[11] *Id*. at ¶ 13.
[12] Objection at ¶ 7.
[13] *Id*.
[14] *Id*. at ¶ 8.

right, MHI has elected to treat the rejection of the License Agreement as a breach[15] and to retain

its rights pursuant to Section 365 (n)(1)(B).[16]

The Trustee's Reply concedes the proper form of MHI's election to retain rights to the

License Agreement pursuant to Section 365(n) but argues that the Court should determine

whether the continued rights asserted by MHI are truly rights to intellectual property.[17] The

Reply goes on to assert that the License Agreement has "cast a cloud of uncertainty over the

intellectual property rights of the Debtor, particularly in regard to the Debtor's ability to improve

SIMA® Technology through modern software and upgrades that would enhance the SIMA

product, its value, and saleability [sic]."[18] Lastly, the Trustee argues that the definition of the

term "adaptations" as it applies under Section 6 of the License Agreement allegedly supports

termination of the exclusivity provisions.[19]

IV.    DISCUSSION

Generally, the rejection of executory contracts is governed by 11 U.S.C. § 365 of the

Bankruptcy Code. Under Section 365, the trustee, subject to the court's approval, "may assume

or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Congress'

principal aim in providing for rejection was to "release the debtor's estate from burdensome

obligations that can impede a successful reorganization." *Bildisco & Bildisco*, 465 U.S. 513, 528,

104 S.Ct. 1188 (1984). The purpose behind Section 365(a) is "to permit the trustee or debtor-in-

possession to use valuable property of the estate and to renounce title to and abandon

burdensome property." *In re Orion Pictures Corp.,* 4 F.3d 1095, 1095 (2d Cir. 1993) (internal

[15] Under 11 USC § 365(g)(1) the rejection of an executory contract constitutes a breach immediately before the date of the filing of the petition.
[16] *Id*. at p.7.
[17] Reply at ¶ 4.
[18] *Id*.
[19] *Id*.

quotations and citations omitted). When the rejected contract, however, is one "under which the

debtor is a licensor of a right to intellectual property," the licensee may elect to "retain its rights

... to such intellectual property," thereby continuing the debtor's duty to license the intellectual

property. 11 U.S.C. § 365(n)(1).

In order to evaluate the application of Section 365(n) in this matter, a review of its

historical context is in order. Prior to the enactment of 11 U.S.C. § 365(n), the Fourth Circuit

issued a decision in *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043

(4th Cir. 1985), in which a debtor-licensor moved to reject a technology license it had granted to

a particular licensee. The court permitted the rejection under Section 365, and held that under

Section 365(g), the rejection of the technology license effectively terminated all contract rights to

the use of the technology process previously granted under the licensing agreement. *Id.* at 1048.

The court stated that the rejection constituted a breach and, as such, the licensee could seek

money damages under Section 365(g). *Id.* However, the Fourth Circuit maintained that the

licensee could not retain any of its contractual rights, and thus the licensee was stripped of all

rights of use it previously held under the licensing agreement. *Id.* This Court, like many others,

does not endorse the reasoning in *Lubrizol* and is not alone in concluding that its reasoning is

flawed. *See Sunbeam Products, Inc. v. Chicago Am. Mfg., LLC,* 686 F.3d 372, 377–78 (7th Cir.

2012) ("Scholars uniformly criticize *Lubrizol,* concluding that it confuses rejection with the use

of an avoiding power.").

Three years after *Lubrizol*, Congress enacted the exception found in Bankruptcy Code

Section 365(n), in response to "certain recent court decisions interpreting that Section 365 has

imposed a burden on American technological development that was never intended…" S.Rep.

No. 100–505, at 1 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3200, 3200. The enactment of Section

7

365(n) was a remedial response to the *Lubrizol* decision, meant to rebalance intellectual property licensee's rights with those of a debtor licensor. Congress was persuaded that the exception would best serve the overall interests of the economy and development of American intellectual property rights threatened by the prospects of harsh treatment in bankruptcy proceedings. *Id*. The relevant provisions of Section 365(n)(1) read as follows:

> (1) If the trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property, the licensee under such contract may elect—
>
>> (A) to treat such contract as terminated by such rejection if such rejection by the trustee amounts to such a breach as would entitle the licensee to treat such contract as terminated by virtue of its own terms, applicable nonbankruptcy law, or an agreement made by the licensee with another entity; or
>>
>> (B) to retain its rights (including a right to enforce any exclusivity provision of such contract, but excluding any other right under applicable nonbankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, to such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law), as such rights existed immediately before the case commenced, for—
>>
>>> (i) the duration of such contract; and
>>> (ii) any period for which such contract may be extended by the licensee as of right under applicable nonbankruptcy law.

"Through this provision, Congress sought 'to make clear that the rights of an intellectual property licensee to use the licensed property cannot be unilaterally cut off as a result of the rejection of the license pursuant to Section 365 in the event of the licensor's bankruptcy.' " *In re Exide Technologies,* 607 F.3d at 965 (quoting S.Rep. No. 100–505, at 1 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3200, 3200). Congress professed that courts allowing the use of Section 365 to strip intellectual property licensees of their rights "threaten an end to the system of licensing of intellectual property ... that has evolved over many years to the mutual benefit of both the

licensor and the licensee and to the country's indirect benefits." S.Rep. No. 100–505, at 3 (1988),

*reprinted in* 1988 U.S.C.C.A.N. 3200, 3202. Thus, in the event that a bankrupt licensor rejects an

intellectual property license, Section 365(n) would now explicitly allow a licensee to retain its

licensed rights for the contract's duration, as such rights existed immediately prior to the

bankruptcy.

      i.      Whether the Trustee's Rejection of the License Agreement Should be Approved

      Generally, courts "approve motions to assume, assume and assign, or reject executory

contracts or unexpired leases upon a showing that the debtor's decision to take such action will

benefit the debtor's estate and is an exercise of sound business judgment." *In re MF Global*

*Holdings Ltd.,* 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012); *see also NLRB v. Bildisco & Bildisco,*

465 U.S. 513, 523, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) (holding that Section 365 is

traditionally subject to the "business judgment" standard). Courts will generally not second-

guess a debtor's business judgment concerning whether an assumption or rejection benefits the

debtor's estate. *In re MF Glob.*, 466 B.R. at 242; *see In re Genco Shipping & Trading Ltd.*, 509

B.R. 455, 463 (Bankr. S.D.N.Y. 2014).

      In this instance, the Trustee's Motion asserts that the largest single asset of the

bankruptcy estate is, potentially, the sale of its intellectual property.[20] The Trustee further

represents to this Court that its obligations under the License Agreement will burden the estate

insomuch as it casts a cloud of uncertainty over the intellectual property rights of the Debtor and

it restricts the ability of any party to enhance SIMA®, therefore reducing the fair market and

resale value of SIMA® to the detriment of the unsecured creditors. The Trustee also asserts that

the costs of maintaining the technical infrastructure to support the estate's obligations under the

---

[20] Motion at ¶ 10.

9

License Agreement are prohibitive. MHI's Objection to the Motion does not challenge the

Trustee's business judgment or proffer.[21] Furthermore, MHI concedes the Trustee's authority

under Section 365 and anticipates that this Court will grant the Motion to Reject.[22] In

determining whether to allow the Trustee's rejection of the License Agreement, this Court finds

that the Trustee's business judgment is entitled to deference and that he has satisfied his burden

of proof.

> ii.      Whether MHI has Duly Elected Under Section 365(n)

Under Section 365(n) of the Code, if a trustee rejects an executory license agreement, the

licensee may continue to insist on the enjoyment of the exclusive rights licensed under

agreement and the right to continue to practice the licensed technology, while the debtor licensor

is relieved from its other affirmative obligations. If the licensee elects to proceed with the license

agreement and maintain the use of the licensed technology, it must continue to pay royalties due

under the agreement.

The relevant provisions of Section 365(n)(2) read as follows:

> (2) If the licensee elects to retain its rights, as described in paragraph (1)(B) of this
>     subsection, under such contract—
>
>     (A) the trustee shall allow the licensee to exercise such rights;
>
>     (B) the licensee shall make all royalty payments due under such
>     contract for the duration of such contract and for any period described
>     in paragraph (1)(B) of this subsection for which the licensee extends
>     such contract; and
>
>     (C) the licensee shall be deemed to waive—
>
>         (i) any right of setoff it may have with respect to such contract
>         under this title or applicable nonbankruptcy law; and

---

[21] Objection at ¶ 3.
[22] *Id*. at p. 8.

10

> (ii) any claim allowable under section 503(b) of this title arising
> from the performance of such contract.

In this instance, MHI has noticed, plainly and unequivocally, its election to retain its rights under the License Agreement pursuant to Section 365 (n)(1)(B). While the statute does not provide for a specific form or type of "writing," the language of the statute is clear and explicit as to the requirements for the purposes of election. A responsive pleading clearly satisfies such requirements.

iii.    Whether the Section 365(n) Election Entitles MHI to Use the SIMA® Trademark

The Court next considers whether MHI retained its rights to use the Debtor's trademarks post-rejection. "Intellectual Property" is defined in 11 U.S.C. § 101(35A) to include patents, copyrights, and trade secrets. It does not reference "trademarks."[23] There is a circuit split with respect to the question of whether a trademark licensee can continue to retain the license post-rejection of the agreement. Some bankruptcy courts have concluded that, after the Fourth Circuit decision in *Lubrizol*, rejection of a trademark license extinguishes the licensee's right to use the trademark. This led a number of courts to conclude by "negative inference" that Congress did not intend to protect trademarks, trademarks should continue to be governed by the *Lubrizol* rationale and trademark rights should lapse upon the rejection of a trademark license. *See In Re Exide,* at 966-67.

In *Exide*, the Court of Appeals for the Third Circuit determined that the applicable trademark license agreement was not executory, and consequently it could not be rejected. The Third Circuit found that the trademark licensee had substantially performed its obligations under the license and, as a result, the perpetual, exclusive, royalty-free license was not executory.

---

[23] Interestingly, the License Agreement explicitly advances a broader definition of intellectual property, which includes trademarks. *See* p.17 *infra*.

Therefore, for reasons unrelated to Section 365(n) protection, the licensee was spared the

*Lubrizol* result and was able to continue using the licensed intellectual property and trademark,

despite the debtor's attempt to reject the license. While distinguishable from this matter, *Exide* is

significant for the analysis set out in Judge Ambro's concurring opinion. In his concurrence,

Judge Ambro disagreed with *Lubrizol* and with the bankruptcy court's determination that

rejection of the license leaves the licensee without the right to use the [debtor's] trademark. In

relying on the legislative history accompanying Section 365(n), Judge Ambro criticized the

bankruptcy court's reasoning that the omission of trademarks from the definition of "intellectual

property" signaled Congressional intent to exclude trademark licensees from the protections of

Section 365(n). Judge Ambro pointed to Congress's statements expecting "the development of

equitable treatment of [trademark licensees' rights] by bankruptcy courts," and argued that courts

should use "their equitable powers to give [debtor] a fresh start without stripping [licensee] of its

fairly procured trademark rights." *Exide,* 607 F.3d at 967. This line of reasoning has been

characterized as "the equities approach."

        Two years later in *Sunbeam*, the Court of Appeals for the Seventh Circuit disagreed with

the equities approach, but arrived at a result that allowed the licensee to retain its rights to the

debtor's trademark under a plain language reading approach. In that case, the Seventh Circuit

held that the limited definition of "intellectual property" in Section 101(35A) means that Section

365(n) does not encompass, and therefore does not protect trademarks. *Id.* at 375.  Judge

Easterbrook, in departing from the equities approach discussed in *Exide,* stated, "[w]hat the

Bankruptcy Code provides, a judge cannot override by declaring that enforcement would be

'inequitable'". *Id*. However, Judge Easterbrook's approach focused on a plain language reading

of Section 365(g), providing that "after rejecting a contract, a debtor is not subject to an order of

12

specific performance…But nothing about this process implies that any rights of the other contracting party have been vaporized." *Id.* at 377. Accordingly, a trademark licensee is entitled to continue to use the trademark because rejection of an executory contract is a breach, not a termination and therefore the contractual use rights of the licensee remain in place.

Also instructive in this analysis is the case of *In Re Crumbs Bake Shop, Inc.,* 522 B.R. 766 (Bankr. D.N.J. 2014). In that case, Judge Kaplan, relying particularly on the legislative history of Section 365(n), rejected the "negative inference" rationale and held that in omitting trademarks from the definition of intellectual property, Congress did not intend to leave trademarks unprotected but merely intended to provide more time for legislative deliberation and, in the meantime, to allow the courts to develop equitable principles that might fill the void. *Id.* at 770-72. Judge Kaplan found it "questionable that Congress intended to sacrifice the rights of licensees for the benefit of the lending community." *Id.* Advancing Judge Ambro's equitable approach, Judge Kaplan allowed the licensee to retain the use of the trademark, asserting that Congress intended the bankruptcy courts to exercise their equitable powers to decide, on a case-by-case basis, whether trademark licensee rights are protected under Section 365(n). *Id.* at 772.

Most recently, in *In re Tempnology, LLC*, 879 F.3d 389 (2018) the First Circuit Court of Appeals held that the rejection by a debtor-licensor of a trademark stripped the licensee of its right to use the trademark post-rejection, reversing a decision by the BAP and reinstating the bankruptcy court's original ruling. *In re Tempnology LLC*, 559 B.R. 809 (B.A.P. 1st Cir. 2016), *aff'd in part, rev'd in part, In re Tempnology, LLC*, 879 F.3d 389 (1st Cir. 2018). The BAP decision advanced the plain language reading of Section 365(n) and Section 365(g). *Id.* at 822. Aligning with the Seventh Circuit ruling in *Sunbeam,* the BAP concluded that trademarks are not encompassed in the categories of intellectual property under Section 365(n) and therefore remain

13

unprotected. *Id*. However, that conclusion overlooks that a licensee could retain use of the

debtor's trademark under Section 365(g) because rejection is deemed a breach and, therefore,

rejection does not necessarily eliminate the rights provided under the contract. *Id*.

In its analysis overruling the BAP, the First Circuit relied on the premise that "effective

licensing of a trademark requires that the debtor…monitor and exercise control over the quality

of the goods sold to the public under cover of the trademark." *In re Tempnology, LLC*, 879 F.3d

389, 402 (1st Cir. 2018). Therefore, allowing the licensee to continue to use the trademark would

impose on the licensor the undue burden[24] of monitoring the use of the trademark, and thereby

undercut the purpose of the rejection powers under the Bankruptcy Code. *Id.* The decision in

effect elevated the bankruptcy reorganization objectives (enhancing value) over the utility of

trademark rights ancillary and supplemental to the intellectual property.[25] The First Circuit

conclusion effectively resurrects the *Lubrizol* rationale to rejection of executory contracts and

ignores Congress' clear intention to rebalance the intellectual property rights of license

counterparties.

In his dissent, Judge Torruella disagreed with the majority's bright-line rule "that

omission of trademarks from the protections of section 365(n) leaves a non-rejecting party

without any remaining rights to use a debtor's trademark and logo." *Tempnology*, 879 F.3d at

405. Quoting Judge Easterbrook in *Sunbeam,* Judge Turruella asserted "an omission is just an

omission," and simply implies that Section 365(n) does not determine how trademark licenses

should be treated, one way or the other. *Id.* This Court agrees that the First Circuit's statutory

---

[24] It is perhaps noteworthy that the legal rigors of trademark policing, <u>not</u> contractual obligations, imposed upon the licensor to monitor its trademarks are the source of the debtor's burdens. Is it markedly different than maintaining a building wherein the debtor has rejected a tenant's lease?

[25] In contrast to this case, the decision also seems to advance an equities analysis that weighs reorganization objectives more heavily in the balance than protections for commerce in intellectual property.

construction, which strains to resurrect *Lubrizol*, is plainly contrary to Congress' explicit efforts to rebalance affected rights on intellectual property and leave Section 365(g) to answer otherwise unresolved trademark issues.

This Court respectfully declines to follow the First Circuit holding and similarly aligns with the plain language reading of Section 365(g) advanced by Judge Easterbrook in the Seventh Circuit. Firstly, under Section 365(g) of the Bankruptcy Code, the rejection of a contract not previously assumed constitutes a breach. *In re Lavigne,* 114 F.3d 379, 387 (2d Cir. 1997). The breach is deemed to occur on the day prior to the debtor's filing for bankruptcy. *See Bridgeport Jai Alai, Inc. v. Autotote Systems, Inc.,* 215 B.R. 651, 657 (Bankr. D.Conn. 1997). Thus, "[r]ejection merely frees the estate from the obligation to perform; it does not make the contract disappear." *In re The Drexel Burnham Lambert Group,* 138 B.R. 687, 703 (Bankr. S.D.N.Y. 1992).

The effect of rejection of an executory contract or unexpired lease is limited to a breach or abandonment by the trustee or debtor in possession rather than a complete termination. 3 C*ollier on Bankruptcy* ¶ 365.10[3], p. 365-83 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Other than the option given to lessees and purchasers of real property to treat rejection as termination, Section 365 does not explicitly provide for termination of a lessee's contract interests. *Id.* [26] Similarly, neither Section 365 nor the Bankruptcy Code determines the parties' rights regarding the License Agreement and subsequent breach. To determine those rights, the Court must look to state law. *Lavigne,* 114 F.3d at 387.

---

[26] Subsections (h) and (i) authorize lessees of real property, timeshare purchasers or buyers of real property to remain in possession of the property after rejection by a lessor or seller or, alternatively, to treat the lease or sale agreement as "terminated" by the rejection. 3 *Collier on Bankruptcy* ¶ 365.10[3], p. 365-83 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

15

Under Connecticut law, [27] a counter-party is relieved of continued performance under a contract if the breach is material. *See Bernstein v. Nemeyer,* 213 Conn. 665, 672–73, 570 A.2d 164 (1990); *Vesce v. Lee,* 185 Conn. 328, 334, 441 A.2d 556 (1981); *Restatement (Second) of Contracts* § 237. A material breach has been defined as one that would justify the other party to suspend his own performance of the contract. *12 Williston on Contracts* § 1469 at 186 (3d. ed. 1970). The Connecticut Supreme Court has held that it is appropriate to look to "the multi-factor standards for materiality of breach contained in the *Restatement (Second) of Contracts* § 241 (1981)," *Bernstein,* 213 Conn. at 672, 570 A.2d 164 (1990).

In applying the multi-factor standards here, the Court finds that the estate's rejection breach is not material. In this instance, the Section 365(n) election indisputably preserves MHI's right to the intellectual property and exclusivity, therefore, the core of the bargain and substantial purpose of the License Agreement has been preserved. [28] Neither Section 365(g) applying state law, nor Section 365(n), provide a basis to terminate MHI's equally central and bargained-for rights in the SIMA® trademark.

Secondly, the use of the SIMA® trademark is not only ancillary to the use of the intellectual property, it is directly embedded within, supplemental to, and integral to the intellectual property license. The licensing and use of the SIMA® intellectual property is synonymous with the licensing and use of the SIMA® trademark.  Section 1.11 of the License Agreement provides in its entirety:

---

[27] Under the terms of License Agreement Section 14.6 titled "Governing Law", the Debtor and MHI agreed that the Agreement was to be governed by, and construed in accordance with the laws of Connecticut.
[28] Ironically, even if the breach were material, the terms of the License Agreement permit the non-breaching party to elect to continue under the terms, or terminate the License Agreement.

1.11.   "SIMA® Technology" means all intellectual property associated with the System for Identifying Motivated Abilities, SIMA®,  and the Motivated Abilities Pattern, MAP®, together with all uses thereof. SIMA® Technology includes but is not limited to the trademarks and copyrights listed on Exhibit A.  Also attached is Exhibit B explaining the sweep of copyright coverage related to SIMA® Technology.

Section 5.1 of the License Agreement titled "Grant of Trademark License" provides in its

entirety:

5.1.   Grant of Trademark License.  Subject to the terms and conditions of this Agreement, Sublicensor hereby grants to Sublicensee a license (the "Trademark License") to use PMI Shares, Inc.'s and Sublicensor's

trademarks relating to SIMA® Technology ("Trademarks") in relation to the Adaptations and Licensed Products; provided that, in each case, such usage shall be approved in advance in writing by Sublicensor.

Section 3.4 of the License Agreement titled "Identification of Licensed Products" so requires any

Licensed Products to carry the following attribution statement:

> © 199_ Marlys Hanson, Inc. This product incorporates certain SIMA (System for Identifying Motivated Abilities) and MAP® (Motivated Abilities Pattern) technology owned by PMI shares, Inc., a Connecticut corporation, which has been licensed to Marlys Hanson, Inc. by People Management International, L.L.C., a Delaware limited liability company, which is the owner of the sole and exclusive licensee of said technology.

In this instance, the License Agreement is clear and unambiguous as to the supplemental

and ancillary nature of the SIMA® trademark within the use of the SIMA® intellectual property.

"If the language of a contract is clear and unambiguous, the contract is to be given effect in

accordance with its terms." *RLI Ins. Co. v. Hartford Accident and Indem. Co.*, 980 F.2d 120, 122

(2d Cir. 1992). Any argument to the contrary would fly in the face of the carefully drafted

provisions provided above that were created for the express purpose of protecting the parties'

rights regarding the use and dissemination of the SIMA® trademark and intellectual property. If

the license to the intellectual property so requires the use of the trademark, this Court finds no

basis to attempt to parse out such agreed upon terms.

Thirdly, the Trustee conceded during oral argument at both hearings that he was less inclined to worry about MHI's use of the trademark, as he understood the SIMA® trademark to be "intertwined" with the intellectual property license. He was more concerned about the exclusivity provision contained in Section 6 of the License Agreement regarding limits on competing products that would have a chilling effect on maximizing the value and utility of the License.

For the foregoing reasons, this Court finds that the election therefore entitles MHI to continue the use of the SIMA® trademark as provided under and throughout the duration of the License Agreement. In this instance, the Court relies on the plain language of Section 365(g), the terms of the License Agreement, and the Trustee's admissions in reaching such a determination.

iv.     Whether the Section 365(n) Election Also Preserves Unto MHI the Exclusive Rights Under Section 6 of the License Agreement to Prevent the Development of Competing Products

Lastly, the Court considers whether the Section 365(n) election also preserves unto MHI the exclusive rights under Section 6 of the License Agreement to prevent the development of competing products. Section 6.1, titled "Limitations on Competing Products" provides in its entirety:

6.1.    Limitation on Competing Products. Sublicensor and Sublicensee agree that, during the term of the License and the Trademark License and for two (2) years after the termination thereof for any reason whatsoever, neither party nor any of its Affiliates will:

6.1.1.   sell any software product that is similar in purpose to the purpose of the Adaptations (referred to as a "competing product" in this Paragraph 6.1); or

6.1.2.   enter into an agreement with any other person for developing, manufacturing, or selling a competing product.

Section 1. Definitions, subsection 1.1, defining "Adaptations" provides in its entirety:

> 1.1.    The "Adaptations" means software programs designed to increase self-analysis skills for managing one's career and the careers of others and incorporating SIMA® Technology.  The Adaptations may include MHI Technology, audio and video aspects, and other additions to SIMA® Technology.

Similar to the trademark analysis discussed above, this Court adopts a plain language approach to reading Section 365(n). Statutory interpretation always begins with the plain language of the statute, *Universal Church v. Geltzer,* 463 F.3d 218, 223 (2d Cir. 2006), which we consider in the specific context in which that language is used, and the broader context of the statute as a whole, *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). We turn to the legislative history <u>only</u> when the plain statutory language is ambiguous or would lead to an absurd result. *Universal Church,* 463 F.3d at 223 (emphasis added). If the statutory language is clear, a court's analysis must end there. *Hartford Underwriters Ins. Co. v. Union Planters Bank, Nat'l Ass'n,* 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.ED.2d 1 (2002). (Internal quotations omitted).

In the instant matter, the Courts' analysis is complete upon a plain language reading of Section 365(n) and its application to the License Agreement. By its very terms, Section 365(n)(1)(B) allows MHI "to retain its rights (including a right to enforce <u>any</u> exclusivity provision of such contract)…under such contract and under any agreement supplementary to such contract, to such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable non-bankruptcy law)." 11 U.S.C. §365(n). (emphasis added). On its face, the plain language of Section 365(n), with reference to the terms of the License Agreement, leaves little room for an alternative interpretation as to whether

MHI's election preserves the exclusive rights under Section 6 of the License Agreement, therefore preventing the development of competing products.[29]

Here, the Trustee's arguments, ungrounded from the language and remedial purpose of Section 365(n) and the explicit rights afforded the licensee are hopeful, but misplaced. The Trustee's broad reliance on the First Circuit's decision *Tempnology*, is simply inapposite. The related issue in *Tempnology*, was an exclusive distribution argument by the non-debtor, not the exclusive rights to exploit the debtor's intellectual property provided under Section 365(n). In fact, Judge Kayatta asserted "[a]n exclusive right to sell a product is not equivalent to an exclusive right to exploit the product's underlying intellectual property". *Tempnology*, 879 F.3d at 398. Section 6 of the License Agreement embodies precisely the kind of exclusive intellectual property rights that are protected by 11 U.S.C § 365 (n)(1)(B).

The Court therefore finds that MHI's election preserves its exclusive rights to prevent the development of "competing products" as defined in the License Agreement.  Lastly, the Court finds that all royalty and payment provisions due to the Debtor's estate under the License Agreement remain in full force and effect, payable directly to the Trustee unless otherwise directed by this Court.[30]

V.    CONCLUSION

Accordingly, it is therefore ordered, decreed, and adjudged: The License Agreement is an executory contract; and (i) rejection by the Trustee is authorized as burdensome upon the

---

[29] The Debtor continuously sought, prepetition, to avoid or otherwise terminate MHI's use of the SIMA® trademark and intellectual property provided under the License Agreement by seeking to invalidate the License Agreement through a declaratory judgment action in the United States District Court for the District of Connecticut in December 2014, *Sima International, Inc. v. Marlys Hanson, Inc.,* Civil No. 2:13-cv-0179 VLB (D. Conn.) and again through arbitration proceedings in June 2017. Those prepetition efforts likewise failed to eviscerate MHI's rights.
[30] Notwithstanding its rejection of the License Agreement, pursuant to 11 U.S.C. 365 (n)(2)(B), the estate is entitled to a right of payment and per the terms of the License Agreement, a royalty rate of 8.33% gross revenues is due payable within 15 days after the end of each calendar quarter.

Chapter 7 estate; (ii) MHI's Section 365(n) election is timely and effective; (iii) in this instance,

rejection does not abrogate MHI's supplemental rights and ancillary use of the SIMA® 

trademark; and (iv) rejection does not abrogate the exclusivity provisions of Section 6 of the

License Agreement or otherwise effect its termination.

      **IT IS SO ORDERED** at Hartford, Connecticut this 17th day of May 2018.

*James J. Tancredi*
United States Bankruptcy Judge
District of Connecticut